UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:07cv140

| | |
|---|---|
| **PERFORMANCE SALES &** ) | |
| **MARKETING, LLC, PSM GROUP,** ) | |
| **INC., and GREG SEREY,** ) | |
| **Plaintiffs,** ) | |
| ) | **ORDER** |
| **v.** ) | |
| ) | |
| **LOWE'S COMPANIES, INC.,** ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the court on Defendant's Motion to Dismiss and Memorandum

in Support (Documents # 10-11), filed April 28, 2008; Plaintiffs' Response (Document # 17), filed

June 17, 2008; and Defendant's Reply (Document # 20), filed July 3, 2008. This matter is ripe for

disposition.

## BACKGROUND

The factual allegations contained in the complaint are detailed, spanning thirty pages and 168

paragraphs, and they are employed to support thirty separately alleged causes of action. What

follows is a general summary of the relevant allegations, as taken from the complaint and presented

in the light most favorable to Plaintiffs, the non-moving parties. More specific facts will be related

as needed during the course of the Court's analysis of the individual claims below.

Plaintiff Greg Serey began doing business in 1991 as a representative for manufacturers of

home improvement products. In 2001, Serey organized his business as Performance Sales &

Marketing, LLC, and in 2003 he reorganized this business as PSM Group, Inc. For purposes of this

Order, PSM Group, Inc., Performance Sales & Marketing, LLC, and the prior unincorporated

business operated by Serey will be referred to collectively as "PSM."

In its role as a manufacturers' representative, PSM helped its customers to market their products to home improvement and hardware retailers. PSM also provided in-store merchandising services for its manufacturer clients once their products were purchased for sale in retail stores. In this capacity, PSM would design, assemble, and maintain in-store displays featuring its clients products, would stock inventory, and would handle the processing of any product returns.

A national meeting of home improvement product manufacturers and their representatives was held in October 2002. At this meeting, Lowe's Vice-President of Merchandising, Marybeth Cornwell, announced that Lowe's would no longer allow manufacturers to hire their own representatives to provide in-store services in Lowe's stores. Instead, manufacturers would be required to pay to Lowe's the amounts formerly paid to their representatives, such as PSM. Lowe's would then use this money to hire in-store service providers who would work directly for Lowe's. According to the complaint, Cornwell simultaneously promised to the assembled manufacturers and their representatives that all of the manufacturers' payments received by Lowe's (the "Manufacturers' Revenue Stream") would then be passed on to the in-store service providers that Lowe's intended to hire.

Also in 2002,[1] PSM began work as an in-store service provider for Lowe's itself. As such, PSM was responsible for the in-store merchandising requirements of more than 100 manufacturers whose products were sold in Lowe's Seasonal Unit category. Shortly after the October 2002 meeting, Lowe's required PSM to terminate its business relationships with all of its other retail and manufacturer customers as a prerequisite for continuing to do business with Lowe's. At this time, approximately $1 million of PSM's annual business was with customers other than Lowe's, which

---

[1]It is unclear from the complaint whether this occurred before or after the October 2002 manufacturers' meeting.

accounted for 40% of PSM's total business. These other customers consisted mainly of manufacturers that PSM represented in their dealings with home improvement stores exclusive of Lowe's.

PSM agreed to Lowe's demands and terminated its relationships with all of its other customers. In so doing, PSM alleges that it specifically relied upon Cornwell's assurance that the entirety of the Manufacturers' Revenue Stream would be transferred by Lowe's to its in-store service providers, such as PSM. For the fiscal years 2003-2006, PSM and Lowe's entered into a series of annual In-Store Service Agreements ("ISSAs"). These contracts formalized the parties' relationship and continued to require PSM to forego any outside business opportunities. Each ISSA also contained a merger clause,[2] meaning a clause which essentially extinguishes prior agreements in favor of the current ISSA.

Under the terms of the 2003 and 2004 ISSAs, PSM was paid 2.5% of the cost of goods Lowe's purchased from the manufacturers in the Seasonal Living unit serviced by PSM. This amount was in line with PSM's expectations and was equivalent to the full amount of the Manufacturers' Revenue Stream for these products. In the 2005 ISSA, however, PSM was to be paid a maximum fee of $17 million, which was $500,000 less than the minimum payment PSM could have received under the previous year's ISSA. (Exh.'s 2-4.) The 2006 ISSA reduced PSM's compensation even further, to $10 million.

Although PSM was unhappy with the changes in compensation in the 2005 and 2006 ISSAs, PSM alleges that Lowe's coerced PSM into accepting these changes by withholding payments owed

---

[2]Although no merger clause appears in the 2006 ISSA attached to the complaint, it appears that this document is missing its final page, which typically contained the merger clause in the other ISSAs.

under the previous year's ISSA until PSM agreed to the terms of the new ISSA.  Since PSM was entirely dependent upon Lowe's for revenue, and since PSM continued to incur operating costs while the ISSA negotiations were ongoing, PSM contends that it had no choice but to accept the terms offered by Lowe's.  PSM asserts that Lowe's has never offered any justification for withholding these payments.

PSM also alleges that Lowe's took advantage of its superior bargaining position to force costly extra-contractual burdens upon PSM.  More specifically, PSM avers that Lowe's required PSM (1) to acquire and maintain two planogram facilities[3] for the benefit of Lowe's, (2) to purchase PDAs for all of PSM's in-store associates, and (3) to move PSM's headquarters to Mooresville, NC.  According to PSM, none of these requirements were imposed by the ISSAs.  Nevertheless, Lowe's purportedly conditioned its continued performance under the ISSAs upon PSM's agreement to these demands.

Although the 2003 and 2004 ISSAs obligated Lowe's to pay to PSM 2.5% of the cost of the goods that were serviced by PSM, PSM contends that Lowe's failed to include the cost of goods purchased for newly opened stores in its payments.  Accordingly, PSM claims that it was underpaid by at least $3.5 million during the terms of the 2003 and 2004 ISSAs.  PSM also alleges that Lowe's miscalculated the compensation owed to PSM under the ISSAs in other ways, such as by improperly offsetting the cost of goods that were purchased but later returned to their manufacturers.

In 2003, PSM developed an online grill parts ordering ("GPO") system for use in Lowe's stores nationwide.  Previously, when a part on a grill at a Lowe's store broke, the grill had been

---

[3]This is a place set up as a mock Lowe's store so that different product layouts could be tried before one agreed upon layout was made the standard for all Lowe's stores.  These planogram facilities also had conference room space, communications facilities, and audio/visual systems.  (Compl. ¶ 75.)

taken out of stock and held by the store until the end of the season. This tied up millions of dollars in unusable inventory, often as a result of minor issues such as broken knobs or wheels. PSM's GPO system fixed this problem by allowing individual parts to be ordered as needed, so that damaged grills could be repaired and placed back in stock quickly.

The GPO system was installed and maintained on PSM's corporate website. From 2003 until the termination of the 2006 ISSA in September of that year, the GPO system cost PSM $200,000 to operate. Despite this, PSM had not required compensation from Lowe's for use of the GPO system. Instead, PSM had intended for Lowe's use of the GPO system to increase PSM's value to Lowe's and to make PSM harder to replace.

This plan began to unravel in March 2006, when Lowe's asked PSM to quote a price for Lowe's use of the GPO system and was told that the cost would be $11 per store per month. In the aggregate, this would have amounted to a total cost of approximately $178,000 per year.[4] Perhaps unhappy with this offer, the next month Lowe's broke off negotiations for use of the GPO system and began to demand that PSM transfer the system to Lowe's without compensation. PSM refused, but PSM alleges that Lowe's was able to obtain a copy of the GPO system software from Unique Solutions, a website host provider used by both Lowe's and PSM. In May 2006, Lowe's sent a letter to PSM stating that Lowe's had implemented its own in-house grill parts ordering system. In spite of this, the letter informed PSM that Lowe's would still require PSM to maintain the original GPO system as a "backup solution." PSM contends that Lowe's "new" in-house ordering system was

---

[4]Although the complaint states the proposed cost for Lowe's use of the GPO system as "approximately $178,000 per <u>month</u>," this same paragraph in the complaint also places the number of Lowe's retail stores at "approximately 1,350." (Compl. ¶ 119.) Based on these numbers, $178,000 per <u>year</u> ($11/month x 1,350 stores x 12 months) appears to be the correct approximation.

simply the PSM GPO system with the Lowe's logo in place of the PSM logo.

At all times during the parties' relationship, Lowe's was required by the Sarbanes-Oxley Act either to make publicly available a code of ethics applicable to its senior officers or else to explain why no such code had been adopted. Pursuant to this Act, Lowe's promulgated a "Code of Business Conduct and Ethics" and provided public access to the Code through its website. Relevant to the instant case, the Code required all Lowe's employees to "comply with all applicable governmental laws" and to "conduct all dealings with Lowe's customers and suppliers . . . honestly and ethically." (Exh. 13.)

In December 2005, Serey was diagnosed with kidney failure and was informed that he would need a transplant to survive. Serey was at this time PSM Group, Inc.'s sole shareholder and CEO. Upon learning of his illness, Serey informed Lowe's senior management of his condition.

In March 2006, PSM discovered that Lowe's was hiring away PSM's employees, and over the next several months Lowe's poached 30 of PSM's 400 service representatives. These service representatives then performed their same duties directly for Lowe's. All the while, PSM was required to continue its performance under the 2006 ISSA.

On July 24, 2006, Lowe's informed PSM that it was terminating the 2006 ISSA effective September 22, 2006. PSM continued to perform its contractual duties until September 17, 2006 and sent Lowe's an invoice for its services on September 19, 2006 in the amount of $637,573.84. Lowe's did not pay this invoice, explaining that the amount "seemed excessive and inconsistent with the historic pattern of work performed by PSM for Lowe's."[5] (Exh. 12.) However, in December

_____

[5]PSM avers that Lowe's did not dispute the amounts owed under the final invoice within thirty days of receipt and thus breached the 2006 ISSA's requirement that all amounts owed be paid within this thirty day period. Although the quoted explanation appears in a December 2006 letter sent more than 30 days after Lowe's receipt of the final invoice, this same letter indicates

2006, Lowe's sent Serey a check for the full amount. The accompanying letter stated that this payment was offered "[i]n the spirit of settlement and compromise." As such, the letter continued by declaring that "[c]ashing the enclosed check will indicate PSM's acceptance of these amounts in full payment, accord and satisfaction of any and all claims held by PSM against Lowe's." Lowe's letter also expressed sympathy for Serey's "serious health issues."

Serey refused to cash the check from Lowe's, and instead chose to file the instant suit on December 28, 2007. Among the thirty counts contained in the complaint are claims for breach of contract, quantum meruit, unjust enrichment, fraud (under a variety of theories), negligent misrepresentation, breach of the duty of good faith and fair dealing, tortious interference with business relations, promissory estoppel, breach of the duty of good faith, breach of fiduciary duties, conversion, copyright infringement, unfair and deceptive trade practices, and intentional and negligent infliction of emotional distress. In the instant motion, Lowe's seeks dismissal, in whole or in part, of twenty-three of these counts.

**STANDARD OF REVIEW**

When deciding a motion to dismiss pursuant to Rule 12(b)(6), this Court must accept the factual allegations of the complaint and must view those allegations in the light most favorable to the plaintiff. Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005). However, the court is not bound to follow the legal conclusions offered in the complaint nor to "accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d

---

that Lowe's met with PSM employees in October 2006 – most likely within the 30 day period – and raised the same concerns regarding cost that are being reiterated in the letter. Thus, PSM's claim that Lowe's did not timely raise any objections to the invoice amount and did not object at all until the letter was sent are contradicted by the letter itself, which was attached as an exhibit to PSM's complaint.

298, 302 (4th Cir. 2008) (quotation omitted). Although "heightened fact pleading of specifics" is not required for a complaint to survive a motion to dismiss, the allegations must provide "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint should be dismissed when the alleged facts only permit the Court to infer "the mere possibility of misconduct" but are not sufficient to show that the requested relief is "plausible." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). In considering the plausibility of a claim, the Court must disregard conclusory statements unsupported by factual allegations, but "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. In short, it is the responsibility of the factual allegations in a complaint, which are accepted as true, to "nudge" the claim "across the line from conceivable to plausible." Id. at 1951 (quoting Twombly, 550 U.S. at 570). At all times during this analysis, the Court should be guided by "its judicial experience and common sense." Id. at 1950.

## DISCUSSION

### A. Counts III and IV

Lowe's contends that PSM's claims for quantum meruit (Count III) and unjust enrichment (Count IV) must fail because PSM has alleged the existence of an express contract. While it is true that the existence of an express contract precludes recovery on either of these theories, see Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co., 594 S.E.2d 425, 429 (N.C. Ct. App. 2004), at this stage in the proceedings the existence of an express contract has not been definitively established. In all of the cases cited by Lowe's, dismissal of claims for quantum meruit or unjust enrichment occurred at a later stage in the case, and in each of these cases, the existence of a valid contract had been established by the evidence before the court. Until the existence of an express contract is proven,

PSM is allowed to plead <u>quantum meruit</u> and unjust enrichment as alternative theories of recovery. FED. R. CIV. P. 8(d); <u>Eastway Wrecker Serv., Inc. v. City of Charlotte</u>, 599 S.E.2d 410, 412 (N.C. Ct. App. 2004). Therefore, Lowe's motion to dismiss will be <u>denied</u> as to Counts III and IV.

## B. Counts V, VII, and VIII

Counts V, VII, and VIII center on the statements (and purported concomitant omissions) made by Lowe's Vice-President Cornwell at the October 2002 national meeting of Lowe's product manufacturers and manufacturers' representatives. More particularly, PSM alleges that Cornwell's assurance given at that meeting – that the entire amount of the in-store service fees paid by the manufacturers to Lowe's would then be distributed to in-store service providers such as PSM – was false when made. As such, PSM seeks damages in Counts V, VII, and VIII for fraud related to this alleged misrepresentation on the part of Lowe's, although each count seeks recovery on a somewhat different theory of fraud.[6]

To establish a claim for fraud, a plaintiff must allege the following elements: "(1) False representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Hardin v. KCS Int'l, Inc.</u> 682 S.E.2d 726, 733 (N.C. Ct. App. 2009) (citations and quotations omitted). Of note, a "claim for fraud may be based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction

---

[6]In Count V, PSM alleges that Cornwell's statements were fraudulent because Cornwell knew at the time the statements were made that Lowe's intended to divert a portion of the Manufacturers' Revenue Stream away from the in-store service providers at some future date. In Count VII, PSM brings a claim for "Silent Fraud by Material Omission," which asserts that Lowe's had a duty to disclose its future intent to retain portions of the Manufacturers' Revenue Stream, and in Count VIII PSM alleges a claim of fraud in the inducement that is indistinguishable from the original fraud claim in Count V.

which the parties had a duty to disclose." Id.

In the present case, PSM has not provided sufficient factual allegations to support the conclusory assertion that Cornwell's representations regarding the Manufacturers' Revenue Stream were false when made, or that they were made with the intent to deceive. Lacking such factual allegations, PSM's claims for fraud must fail.

The only facts alleged to support these two elements of PSM's fraud claim are (1) that the statements were made and (2) that over two years later, Lowe's decided to reduce its payments to PSM. Although these factual allegations allow for the "mere possibility" that Lowe's committed fraud, they are insufficient as a matter of law to establish the plausibility of these claims. By themselves, these two facts are simply inadequate to "nudge" PSM's claims of fraud "across the line from conceivable to plausible." Iqbal, 129 S.Ct. at 1951.

On the basis of the allegations in the complaint, it is much more likely that Cornwell's statements were true to the best of her knowledge at the time they were made and that these statements were not made with the intent to deceive. As alleged elsewhere in the complaint, PSM received all of the money that it expected to receive in conformity with Cornwell's assertions for the two years immediately following the manufacturers' meeting. Although Cornwell might have known that Lowe's would one day wish to keep some of the Manufacturers' Revenue Stream for itself at the October 2002 meeting, and although Lowe's might then have waited two years to unveil its true intentions in an effort to avoid charges of fraud, the much more plausible scenario is that Lowe's, after acting in accordance with Cornwell's representations for two years, simply adopted a new business strategy. The commercial world is not static, and Cornwell's representations did not purport to bind Lowe's actions for any specific term of years.

In light of the foregoing, PSM's allegations of fraud in Counts V, VII, and VIII will be

dismissed.

### C. Count VI

In Count VI, PSM asserts a claim for negligent misrepresentation premised on the same facts as the claims for fraud discussed above. To prevail on a claim for negligent misrepresentation, a party must show (1) that he justifiably relied, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care. <u>Jordan v. Earthgrains Cos., Inc.</u>, 576 S.E.2d 336, 339 (N.C. Ct. App. 2003). Based on the Court's findings with regard to PSM's similar claims for fraud, the Court holds that PSM has not alleged facts sufficient to show that the information presented by Cornwell was prepared without reasonable care. As shown above, PSM's allegations do not establish that Cornwell's representations were false when made. In addition, Cornwell's representations held true for a two year period. Thus, the Court finds that PSM has not adequately supported its claim for negligent misrepresentation.

The Court is also of the opinion that any reliance based on Cornwell's statements was unreasonable to the extent that these statements were not commemorated in the parties' written contracts, which contained merger clauses. If PSM had desired an assurance that Lowe's would pay the full amount of the Manufacturers' Revenue Stream to PSM for a set number of years, PSM could have negotiated for a contract with a term greater than one year.

For all of these reasons, Count VI will be <u>dismissed</u>.

### D. Count IX

The parties agree that this Count should be dismissed as outside of the applicable statute of limitations. Upon review, the Court is of the same opinion. Count IX will, therefore, be <u>dismissed</u>.

### E. Counts XI and XII

Counts XI and XII allege that economic duress forced PSM to enter into, respectively, the

2005 and 2006 ISSAs on unfavorable terms.  PSM alleges that at the times when these ISSAs were signed by the parties, Lowe's was withholding payments for services rendered by PSM under the prior year's ISSA that Lowe's was contractually obligated to pay.  PSM alleges that Lowe's had no good faith motive for doing so, and that Lowe's purpose in withholding the payments was to coerce PSM into entering the new ISSAs on terms favorable to Lowe's.  PSM further alleges that Lowe's knew at the relevant times that PSM was entirely dependent on Lowe's for revenue, and that PSM would be forced to shutdown because of inability to make payroll and other expenses if PSM did not receive the payments from Lowe's that were due and owing.  After the new ISSAs were signed, both parties agree that Lowe's made the payments from the previous year that were still outstanding.

Duress exists where one party to a contract, by the wrongful act of another, is induced to enter the contract under circumstances which deprive him of the exercise of free will.  Radford v. Keith, 584 S.E.2d 815, 817 (2003) (citation omitted).  A simple breach of contract by itself is not sufficient to state a claim for duress, George Shinn Sports, Inc. v. Bahakel Sports, Inc., 393 S.E.2d 580, 584 (N.C. Ct. App. 1990), especially where the other party has an adequate remedy at law, Rose v. Vulcan Materials Co., 194 S.E.2d 521, 536 (N.C. 1973).  However, "if failure to receive the promised performance will result in irreparable injury to business, the threat may involve duress. . . . [A] threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power not derived from the contract itself."  Rose, 194 S.E.2d at 536.

In Rose, the plaintiff had a contract to purchase stone from the defendant.  When the defendant later refused to perform the contract at the agreed price, the plaintiff protested but continued to purchase materials from the defendant at the higher price because the plaintiff had no other source for the stone it required.  In that case, the trial court found that the plaintiff faced the

12

choice of "either going out of business or continuing to purchase from the defendant" at the higher price.  Id.  After considering these facts, the Supreme Court upheld the trial court's finding of duress.  The Supreme Court concluded that the defendant's breach of contract was wrongful, that the defendant's threat to cease sale of the stone to plaintiff without the increased payments had induced the plaintiff to purchase at the higher price, and that the coercive power of defendant's threat "was effective as a result of defendant's economic power derived from his status as sole supplier of stone, not because of any economic power derived from the contract itself."  Id. at 537.

In the instant case, Lowe's contends that its breach of contract is insufficient to establish duress and that there could be no aggravating circumstances in the present case because PSM had adequate remedies at law.  However, Lowe's alleged actions in the present case are sufficiently similar to the actions of the defendant in Rose to allow PSM's claim of duress to proceed.  Like the defendant in Rose that threatened to withhold the stone necessary for the operation of the plaintiff's business, in this case Lowe's threatened to withhold the money that was essential to the continued operation of PSM's business.  At the time Lowe's withheld the payments that were due to PSM, Lowe's knew that PSM had no other source of income.  Also like the defendant in Rose whose power arose from its status as sole provider of the plaintiff's stone, the coercive power of Lowe's threat in the present case was derived from its status as sole patron of PSM's business and not from any economic power legitimately granted to Lowe's by the ISSA itself.[7]  The facts recited create a sufficiently plausible claim.  As a result, the Court finds that PSM has in this case adequately stated a claim for duress, and Lowe's motion to dismiss this count will be denied.

---

[7]Although the ISSAs required PSM to work solely for Lowe's, they did not give Lowe's the right to take advantage of this relationship for coercive purposes by withholding payments owed.

13

**F. Count XIII**

In this Count, PSM claims that Lowe's breached the ISSAs by requiring PSM to move its corporate headquarters, to establish and to maintain a planogram facility, and to procure PDAs for all of PSM's employees. Lowe's argues that the first two bases of this claim alleged by PSM are barred by the statute of limitations. Lowe's further asserts that requiring PSM to purchase PDAs could not have breached the ISSAs, as the ISSAs themselves required PSM to purchase PDAs. Finally, Lowe's contends that PSM has not sufficiently alleged which terms of the ISSAs were breached by Lowe's purported actions. In its response, PSM does not address the substance of Lowe's arguments but merely states in a conclusory fashion that the complaint adequately alleges the existence of a contract, breach, and damages.

*1. Statute of Limitations*

Under North Carolina law, the statue of limitations for bringing a cause of action for breach of contract is three years. N.C. Gen. St. § 1-52(1). This period "begins to run when the plaintiff's right to maintain an action for the wrong alleged accrues. The cause of action accrues when the wrong is complete, even though the injured party did not then know the wrong had been committed." <u>Housecalls Home Health Care, Inc. v. State Dep't of Health and Human Servs.</u>, 682 S.E.2d 741, 744 (N.C. Ct. App. 2009) (quotation omitted).

In the present case, PSM asserts that Lowe's required PSM to establish the first planogram facility in 2003. (Compl. ¶¶ 75, 80.) Shortly thereafter, PSM was obliged to acquire a second planogram facility. Although the complaint states that Lowe's required the purchase of this second planogram facility after awarding PSM new product categories in June 2003, (Compl. ¶ 81), the complaint does not state with certainty how much time elapsed, if any, between the award of the new product categories and Lowe's demand for a second planogram facility, (Compl. ¶¶ 82-83).

14

Based on these facts, any claim for breach of contract premised on the establishment of the first planogram facility is barred by the statute of limitations. The breach occurred in 2003. At that point, PSM's cause of action accrued and the wrong was complete, even if the injury stemming from that wrong continued into the future. The complaint in the instant case was not filed until 2007, which is past the expiration of the three year statute of limitations.

However, the claim related to the acquisition of the second planogram facility is not definitively barred by the allegations contained in the complaint, since the complaint does not allege with specificity when PSM was required to purchase this planogram facility or when the planogram facility was actually purchased. Because a statute of limitations defense raised in the context of a rule 12(b)(6) motion can only succeed if it appears on the face of the complaint that the action is barred, Faircloth v. Nat'l Home Loan Corp., 313 F. Supp. 2d 544, 552 (M.D.N.C 2003), PSM's claim for breach of contract related to the purchase of the second planogram facility will be allowed to proceed for now.

The facts pled to support the breach of contract claim related to PSM's headquarters move are equally imprecise regarding dates. Because the complaint says that Lowe's required the move "in or about 2003," and because the complaint does not allege the date when the move actually occurred, the Court will allow this claim to proceed as well. The "in or about" phrasing leaves open the possibility that this requirement was imposed later than 2003 and was thus within the three year statute of limitations period.

### 2. Whether the contract was breached

At the outset, the Court agrees with Lowe's that the ISSAs gave Lowe's the authority to require PSM to purchase PDAs for its employees in the year 2005. The 2005 ISSA states in art. 1, ¶ 5:

    <u>Computing Devices</u>.  VSG [Vendor Service Group, i.e. PSM] shall ensure that all VSG personnel are equipped with fully functioning portable computing devices and other technology designated by Lowe's for communication with VSG management and prioritizing workloads.  Such technology shall include software specified by Lowe's for the purpose of vendor service tracking.

A similar provision is found in the 2006 ISSA, art. 1, ¶ 6.  For this reason, PSM's purchase of the PDAs, which are portable computing devices, cannot support a claim for breach of contract.

    On the other hand, at this stage in the proceedings – and putting aside statute of limitations concerns – the Court finds that PSM has sufficiently alleged a breach of contract regarding the corporate headquarters move and the construction of the second planogram facility.  "When a seller refuses to perform his contract at the agreed price and demands a higher price, the buyer who proceeds to buy at such a higher price may recover for overpayments in a suit for restitution if he can establish that he acted under economic duress."  <u>Rose</u>, 194 S.E.2d at 535.  PSM avers that Lowe's required PSM to undertake added, extracontractual expenses in order to continue the business relationship between the parties despite the existence of the ISSAs, whose terms already governed this relationship.  PSM further asserts that it complied under economic duress arising from Lowe's status as PSM's sole source of income.  Given these alleged facts, the instant case bears enough resemblance to the situation in <u>Rose</u>, discussed previously, for PSM's restitution claim to proceed for now.

    Therefore, Lowe's motion to dismiss will be <u>granted</u> as to PSM's claim for breach of contract related to the first planogram facility and <u>denied</u> as to all other claims of breach of contract alleged by PSM in this count.

### G.  Count XIV

    In Count XIV, PSM alleges that Lowe's tortiously interfered with its business relationships with third parties by requiring PSM to terminate its business with all other companies as a

prerequisite to continuing as Lowe's in-store service provider. To state a claim for tortious interference with a business relationship, a party must allege

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

Embree Constr. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992). Here, PSM has not satisfactorily alleged element three. PSM does not contend that Lowe's induced the other companies to cease business with PSM. Instead, PSM admits that it voluntarily terminated these relationships in order to maintain its business with Lowe's. Thus, PSM has failed to state a claim for tortious interference with a business relationship, and this count will be dismissed.

### H. Count XV

Both parties agree that the claim for promissory estoppel alleged in this count is not supported by existing North Carolina law. This Court concurs. Accordingly, Count XV is dismissed.

### I. Count XVI

In Count XVI, PSM alleges that Lowe's breached the contractual duty of good faith by:

1) Unilaterally changing the terms of the 2006 ISSA to alter PSM's method of compensation from the contractually provided for flat, monthly rate to an amount based on hours unilaterally allocated by Lowe's;

2) Unilaterally changing the terms of the ISSAs to require PSM to move its corporate headquarters, at an expense to PSM of approximately $1,200,000.00;

3) Unilaterally changing the terms of the ISSAs to require PSM to acquire and maintain planogram facilities at an expense to PSM of approximately $128,000.00;

4) Unilaterally changing the terms of the ISSAs to require that PSM purchase and provide PDAs to its service representatives at a cost to PSM of approximately $396,750.00;

5) Using its superior economic position to improperly extract a series of contract price reductions while simultaneously requiring an increased level of services from PSM;

6) Refusing to compensate PSM for its development and maintenance of the GPO system;

7) Misappropriating PSM's GPO system for its own use;

8) Impairing PSM's ability to service Lowe's accounts and to fill allocated hours by hiring key employees away from PSM, with the ultimate goal of terminating PSM's contractual and business relationships with Lowe's; and

9) Refusing to pay the $637,573.84 that Lowe's owed to PSM for invoiced work under the 2006 ISSA, holding these funds hostage in an effort to extract concessions from PSM, and threatening to drag out an extensive audit of the invoices unless PSM agreed to waive all of its claims against Lowe's.

(Compl. ¶ 280.)

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Williams v. Craft Dev., LLC, 682 S.E.2d 719, 723 (N.C. Ct. App. 2009) (quotation omitted). Where the claim for breach of good faith is "part and parcel" of a similar claim for breach of an express term of the contract, that claim will rise and fall with the other breach of contract claim, Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (quoting Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 368 (N.C. Ct. App. 1996)), Claggett v. Wake Forest Univ., 486 S.E.2d 443, 447 (N.C. Ct. App. 1997) (holding the same), and only a single recovery of damages will be allowed. Murray, 472 S.E.2d at 368-69. Furthermore, because the covenant of good faith and fair dealing is an implied term, it cannot be used to contradict the express terms of a contract, Rich Food Servs., Inc. v. Rich Plan Corp., 98 Fed. Appx. 206, 211 (4th Cir. 2004) (unpublished) (citing Campbell v. Blount, 210 S.E.2d 513, 515 (N.C. Ct. App. 1975)). This understanding conforms with the central purpose of the implied duty of good faith, which is to allow

enforcement of a vague or incomplete agreement that the ratifying parties intended to be binding but that lacks certain terms essential to proper contract formation. See Ultra Innovations, Inc. v. Food Lion, Inc., 502 S.E.2d 685, 687 (N.C. Ct. App. 1998). In these cases, the duty of good faith provides the missing terms of the agreement that necessarily flow from the parties' intentions, thus allowing enforcement of the contract. See id. (holding that duty of good faith required reasonable commercial efforts to sell object of contract, even though this obligation was not established by the express contract terms).

Lowe's argues for the dismissal of this claim to the extent that it is premised on items 1-5 and 9, listed above. Significantly, PSM does not allege in its complaint that the duty of good faith in this case had any source other than the contracts between the parties. For this reason, and also because PSM's allegations of breach of the duty of good faith in items 1-4 and 9 center on alleged breaches of express contract terms, these claims rise and fall with the underlying claims for breach of contract. Therefore, the allegations of breach of the duty of good faith contained in items 1-4 and 9 are duplicative of PSM's allegations of breach of contract elsewhere in the complaint and will be dismissed. Item 5 is likewise duplicative of PSM's claims of breach of contract and duress, and it will be dismissed as well. However, PSM will still be entitled to press theories of breach of good faith in support of its claims for breach of contract.

As Lowe's has not argued for dismissal of this count regarding the other alleged bases of the claim, those portions remain for later adjudication.

In light of the foregoing, Lowe's motion to dismiss Count XVI will be granted as to items 1-5 and 9 and denied as to the other proffered theories of liability.

### J.  COUNT XVII

Here, PSM alleges that on the basis of the parties' relationship, Lowe's owed fiduciary duties

to PSM, which Lowe's then breached by refusing to pay PSM its full share of the Manufacturers' Revenue Stream. North Carolina courts have declined to define specifically what qualifies as a fiduciary relationship because "[t]he relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." <u>Tin Originals, Inc. v. Colonial Tin Works, Inc.</u>, 391 S.E.2d 831, 833 (N.C. Ct. App. 1990) (quoting <u>Abbitt v. Gregory</u>, 160 S.E. 896, 906 (N.C. 1931)). Thus, the key ingredients in a fiduciary relationship are "confidence reposed on one side, and resulting domination and influence on the other." <u>Id.</u> This is a "broad standard," and the issue is usually one for the jury to decide. <u>Id.</u> at 832-33.

However, the North Carolina courts have held that a few specific relationships are not fiduciary as a matter of law. As it happens, the circumstance of "mutually interdependent businesses" is one of the relationships in which a fiduciary duty does not arise. <u>Id.</u> at 833; <u>see</u> <u>also</u> <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 347-48 (4th Cir. 1998) (holding that under North Carolina law "parties to a contract do not thereby become each others' fiduciaries," especially when both parties are sophisticated businessmen and the contracts underlying the parties' relationship contain a merger clause). Therefore, PSM's claim for breach of fiduciary duties in Count XVII will be <u>dismissed</u>.

### K. COUNT XIX

PSM alleges in Count XIX that Lowe's appropriation for itself of a portion of the Manufacturers' Revenue Stream amounts to conversion. North Carolina courts define conversion as "(1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner." <u>Di Frega v.</u>

Pugliese, 596 S.E.2d 456, 463 (N.C. Ct. App. 2004). Here, Lowe's asserts that PSM has failed to state a claim for conversion because PSM has not established its ownership of the Manufacturers' Revenue Stream. This Court is in agreement with Lowe's.

Once the manufacturers began making payments to Lowe's instead of to the in-store service providers such as PSM, the Manufacturers' Revenue Stream was no longer the property of PSM. Thereafter, PSM was only entitled to whatever payments from the Manufacturers' Revenue Stream Lowe's was contractually obligated to provide pursuant to the ISSAs. Thus, a claim for breach of contract is the proper remedy, and PSM has in fact brought just such a claim. Accordingly, this count will be dismissed.

### L. COUNTS XX, XXI, XXII

In each of these counts, PSM asserts fraud or negligent misrepresentation on the basis of Lowe's statements in its Code of Business Conduct. In particular, PSM alleges that Lowe's representations in this Code that Lowe's would "comply with all applicable governmental laws" and would "conduct all dealings with Lowe's customers and suppliers . . . honestly and ethically" were fraudulent. PSM asserts that Lowe's acted contrary to these provisions as shown by Lowe's treatment of PSM and as alleged throughout the complaint.

To reiterate, the essential elements of fraud under North Carolina law are (1) a false statement or concealment of a material fact, (2) that is reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, and (5) that results in damages to the defrauded party. Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974). "There is a requirement of specificity as to the element of a representation made by the alleged defrauder. The representation must be definite and specific. . . . Requiring proof of a specific representation facilitates courts in distinguishing mere puffing, guesses, or assertions of opinions from representations of material

facts." Rowan County Bd. of Educ. v. U.S. Gypsum Co., 418 S.E.2d 648, 659 (N.C. 1992). The degree of specificity required "depends upon the tendency of the statements to deceive under the circumstances." Ragsdale, 286 S.E.2d at 500.

In view of this standard, PSM's claims of fraud alleged in these counts are deficient and will be dismissed. First, the statements in the Lowe's Code of Business Conduct were not material to the transaction between the parties, as these statements were exceedingly general and did not specifically bear on the parties' relationship. Statements that a party will act honestly or fairly, especially when made to no one in particular, are simply not sufficient to support a claim for fraud. Furthermore, assurances of honesty can only be proven false if the same party later makes other statements that are themselves false. It is these more specific false statements that should be relied upon to support a claim for fraud, and PSM has in fact alleged claims for fraud related to more specific statements made by Lowe's in this case.

Second, there are no facts alleged in the complaint that lend support, even by way of inference, to the naked assertion that the statements in Lowe's Code of Business Conduct were calculated to deceive or were made with the intent to deceive.

Third, there is no allegation that PSM relied on the representations made in the Code. Notably, PSM never specifically alleges in the complaint that it had read the Code or even knew of its existence before entering into the ISSAs. To the extent that PSM does attempt to allege reliance, this reliance is premised on the mere existence of the Code and not on any statements actually made in the Code. Significantly, PSM does not aver in the complaint that it was misled by anything said in the Code. Instead, PSM merely argues that "if Lowe's had not . . . publicized a Code of Business Conduct . . . [PSM] would have been forewarned from doing business with Lowe's . . . and/or would have ceased doing business with Lowe's." (Compl. ¶ 297.)

Fourth, the complaint does not sufficiently allege that the representations in the Code proximately caused PSM damages. The proximate cause of PSM's damages, if any, would be the other, more specific false statements, if any, later made by Lowe's, or any other independently wrongful actions committed by Lowe's. The connection with the Code and the harm alleged in this count is therefore too tenuous to support PSM's claims of fraud.

PSM's claim of negligent misrepresentation in Count XXI, which is founded on the same facts as the claims for fraud in Counts XX and XXII, is similarly defective. As set forth previously, negligent misrepresentation "occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care." Jordan, 576 S.E.2d at 339 (N.C. Ct. App. 2003) (quoting Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988)). With reference to the discussion above, it is clear that PSM has not sufficiently alleged either justifiable reliance or detriment.

For all of these reasons, PSM's claims of fraud and negligent misrepresentation in Counts XX, XXI, and XXII will be dismissed.

**M. COUNT XXVII**

Both parties agree that this Count duplicates Count XXVIII. Accordingly, Count XXVII will be dismissed.

**N. COUNT XXVIII**

In this Count, PSM asserts a claim for Unfair and Deceptive Trade Practices ("UDTP"), which specifically alleges seven practices that PSM claims were either unfair or deceptive. The complaint describes Lowe's allegedly unfair and/or deceptive practices as follows:

1) Refusal to pay amounts invoiced by PSM "in an effort to destroy PSM's ability to pursue its legal remedies against Lowe's";

2) "[A]cts of theft, deceit, conversion, and misappropriations" related to Lowe's continued use of the GPO system without compensation to PSM, as alleged in Counts XXIII–XXVI;

3) Acts of fraud and misrepresentation alleged in Counts V–VIII (i.e., the representations regarding the Manufacturers' Revenue Stream) and Counts XX–XXII (i.e., the representations made in the Code of Business Conduct);

4) Tortious interference with PSM's business relationships with third parties as described in Count XIV;

5) Breach of the implied duties of good faith and fair dealing described in Count XVI;

6) Lowe's use of its superior economic power to coerce PSM into entering unfavorable contracts and to prevent PSM from pursuing its otherwise available legal remedies as described in Counts VIII, XI, and XII; and

7) The intentional and negligent infliction of emotional distress described in Counts XXIX and XXX.

(Compl. ¶ 348.)

North Carolina law prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. St. § 75-1.1(a). Whether an act or practice violates this statute is a question of law for the court. Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 620 S.E.2d 222, 230 (N.C. Ct. App. 2005). To establish a claim for UDTP, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the unfair or deceptive practice resulted in injury to the plaintiff. First Atl. Mgmt. Corp. v. Dunlea Realty Co., 507 S.E.2d 56, 63 (N.C. Ct. App. 1998). "A trade practice is unfair if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. . . . [A] trade practice is deceptive if it possesses the tendency or capacity to mislead, or creates the likelihood of deception." Id. (quotations omitted). Significantly, an act may be deceptive even without a showing of deceit or bad faith, so long as it has the tendency to mislead or to deceive under the circumstances. Id. at 64.

24

To the extent that the instant UDTP claim is premised on the above item 1 (refusal to pay amounts invoiced after termination of the parties' relationship), item 3 (fraud and negligent misrepresentation), item 4 (tortious interference with business relationships), and item 7 (intentional and negligent infliction of emotional distress), the claim will be dismissed. Regarding item 1, Lowe's decision to make payment of the full amount invoiced by PSM under the 2006 ISSA contingent upon PSM's acceptance of this payment as accord and satisfaction was neither unfair nor deceptive. The letter sent by Lowe's and attached to PSM's complaint indicates that the value of PSM's services was contested in good faith, so Lowe's request for accord and satisfaction in return for payment of the full amount was not unreasonable. Even if Lowe's had disputed the amount invoiced in bad faith, Lowe's refusal to pay under the circumstances would not be an unfair trade practice. Absent aggravating circumstances, a simple breach of contract, even if intentional, is not a UDTP. Haynes v. B & B Realty Group, LLC, 633 S.E.2d 691, 696 (N.C. Ct. App. 2006) (quotation omitted). Here, the only alleged aggravating circumstance is the request for accord and satisfaction, and this is not enough to support a UDTP claim.

As for item 3, as is evident from the discussion of PSM's fraud and negligent misrepresentation claims elsewhere in this Order, the allegedly fraudulent and false statements made by Lowe's did not have the tendency to mislead or to deceive under the circumstances. Turning to item 4, because PSM freely made the decision to terminate its other business relationships and to do business solely with Lowe's, this item does not support a claim for UDTP either. Lastly, regarding item 7, the Court finds that Serey's claims for emotional distress do not support a cause of action for UDTP. For one thing, the Court holds, infra, that the facts alleged in the complaint do not support a claim for emotional distress in the context of a contractual relationship. For another, Lowe's offer to pay the amounts claimed by PSM only if PSM agreed to waive any legal claims

against Lowe's is not so atypical as to merit sanction, as discussed above, even after taking into account Serey's medical condition. In this regard, PSM has not offered anything more than conclusory statements to support its assertion that Lowe's acted with malice or with the intention of exploiting Serey's poor health for its own advantage.

On the other hand, the Court finds that PSM's remaining allegations of UDTPs are sufficient to survive Lowe's motion to dismiss. If, as PSM alleges, Lowe's used its superior bargaining powers unfairly and coercively, or if Lowe's misappropriated PSM's GPO system without compensation,[8] then these behaviors might fairly be categorized as "unethical, oppressive, [or] unscrupulous" and may support a claim for UDTP. Lowe's alleged breach of the duty of good faith might also subject Lowe's to UDTP liability for similar reasons. However, the Court will only allow PSM's UDTP claim to proceed on this theory in regards to PSM's particular allegation that Lowe's breached the duty of good faith by hiring away PSM's employees. See Sunbelt Rentals, Inc., 620 S.E.2d at 229-31 (holding that unscrupulous and surreptitious hiring away of competitor's employees violated N.C. Gen. St. § 75-1.1). The additional allegations of breach of the duty of good faith set forth in Count XVI simply duplicate the other alleged bases for UDTP that are asserted in the instant count, and thus they will not be considered separately.

Based on the foregoing, the Court will grant Lowe's motion to dismiss PSM's UDTP claim with regard to items 1, 3, 4, and 7 and will deny Lowe's motion to dismiss PSM's claim for UDTP with respect to items 2, 5, and 6.

### O. COUNTS XXIX and XXX

Counts XXIX and XXX purport to state claims for intentional and negligent infliction of

---

[8]Lowe's concedes that dismissal of this claim is inappropriate inasmuch as it relates to Lowe's use of the GPO system.

emotional distress, respectively. In essence, PSM alleges that Lowe's failure to pay past due invoices owed under the final ISSA was not only a breach of contract but was also so egregious under the circumstances, especially with reference to Serey's deteriorating health, as to cause severe emotional distress. However, to recover damages for mental anguish in relation to a breach of contract action, the claimant must show:

> First, that the contract was not one concerned with trade and commerce with concomitant elements of profit involved. Second, that the contract was one in which the benefits contracted for were other than pecuniary, i.e., one in which pecuniary interests were not the dominant motivating factor in the decision to contract. And third, the contract must be one in which the benefits contracted for relate directly to matters of dignity, mental concern or solicitude, or the sensibilities of the party to whom the duty is owed, and which directly involves interests and emotions recognized by all as involving great probability of resulting mental anguish if not respected.

Reis v. Hoots, 509 S.E.2d 198, 205 (N.C. Ct. App. 1998) (quoting Johnson v. Ruark Obstetrics, 395 S.E.2d 85, 96 (N.C. 1990)). The contract in the instant case was commercial in nature, had pecuniary interests as its dominant motivating factor, and did not have as its purpose matters related to dignity or mental concern or solicitude. As such, the claim fails to plead even one of the three essential elements for maintaining an emotional distress claim related to a breach of contract. Accordingly, Counts XXIX and XXX will be dismissed.

### P. DAMAGES IN EXCESS OF AMOUNTS PERMITTED BY CONTRACT

The final argument contained in the motion now before the Court requests dismissal of all portions of the complaint that seek "damages in excess of an amount equal to the fees paid by Lowe's for services performed during the 60 days prior to the assertion of the claim." (Def.'s Reply at 21.) Lowe's supports this request with reference to a limitation of damages clause contained in the ISSAs. Nonetheless, the Court finds that this relief is sought prematurely, and the Court will decline to grant the motion at this time. Although this Court recognizes that the law of North

Carolina looks favorably upon limitation of damages provisions, <u>Blaylock Grading Co., LLP v. Smith</u>, 658 S.E.2d 680, 682-83 (N.C. Ct. App. 2008), such provisions will not be enforced where the result would be unconscionable and "elicit a profound sense of injustice," <u>id.</u> at 683. PSM argues that this situation qualifies as such, and resolution of this question is best left until further factual development of the case. Additionally, even if the limitation of damages provision should be upheld regarding the contract claims, whether this provision would limit the amounts recoverable on PSM's quasi-contract and unfair and deceptive trade practices claims is also an open question at this time. For these reasons, Lowe's motion to limit the amount of recoverable damages will be <u>denied</u> at present. However, Lowe's remains free to raise the same argument later in this case.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, Lowe's Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

**IT IS HEREBY ORDERED** that the following counts of the complaint are **DISMISSED** in their entirety: V, VI, VII, VIII, IX, XIV, XV, XVII, XIX, XX, XXI, XXII, XXVII, XXIX, and XXX.

**IT IS FURTHER ORDERED** that the following counts of the complaint are dismissed in part, as described more fully above: XIII, XVI, XXVIII.

All other counts remain. The issue of damages is left for future decision of the Court.

**SO ORDERED.**

Signed: June 4, 2010

Richard L. Voorhees
United States District Judge

28