**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CASE NO. 5:07-CV-00140-RLV-DLH**

| | |
|---|---|
| PERFORMANCE SALES & ) | |
| MARKETING LLC, PSM GROUP, ) | |
| INC., and GREG SEREY, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **MEMORANDUM AND ORDER** |
| ) | |
| LOWE'S COMPANIES, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on Defendant Lowe's Motion to Strike (Doc. 96)

and Motion to Dismiss (Doc. 98), both filed March 31, 2011, and Objection to Magistrate

Judge's Decision (Doc. 171), filed November 16, 2011.

## I. PROCEDURAL AND FACTUAL HISTORY

The Order of the Magistrate Judge (Doc. 167), to which Defendant Lowe's objects, grants

Plaintiffs Performance Sales & Marketing, PSM Group, and Greg Serey's (collectively,

"PSM's") Motion to Compel the testimony of Robert Niblock, Lowe's President, Chief

Executive Officer, and Chairperson; Gregory Bridgeford, Lowe's Executive Vice President of

Business Development; and Robert Hull, Lowe's Executive Vice President and Chief Financial

Officer (Doc. 149).[1] In so ordering, the Magistrate Judge was "[c]ognizant of the potential for

abuse and harassment from allowing the deposition of the CEO or other high-level corporate

---

[1] The Motion initially requested that Perry Jennings, former Senior Vice President for
Human Resources, also be produced for deposition, but PSM later withdrew this request. (Doc.
166 at 2 n.1.)

1

executives at large public companies such as Lowe's," found that the depositions "are not intended to harass, embarrass, or burden the deponents," and limited the depositions' scope to the deponents' personal knowledge of the consolidation and eventual elimination of vendor service groups. (Doc. 167 at 3–4.)

A general statement of the facts surrounding the parties' relationship is available in the Court's prior Order concerning Lowe's Motion to Dismiss the original Complaint. (Doc. 45.) The Court here articulates the allegations and evidence pertinent to Plaintiffs' claims of fraud and misrepresentation (Counts V, VI, VII, and VIII), and related contention that Lowe's had an undisclosed plan to eliminate third-party, in-store-service providers ("ISSPs") and take their work in-house.

In their Amended Complaint, Plaintiffs altered the nature of their fraud-based claims. Where Plaintiffs had argued that Lowe's representations regarding the Manufacturers' Revenue Stream were false when made or were made with the intent to deceive, Plaintiffs now argue that Lowe's created an "In-Store Services Strategy," predating Plaintiffs' exclusive business relationship with Lowe's, by which Lowe's would capture the revenue stream and then terminate its relationships with ISSPs within a few years while simultaneously representing that the relationships would be maintained so long as the ISSPs performed well. The Court's Order granting leave to file the Amended Complaint stated that Plaintiffs have provided sufficient factual allegations for the revised fraud claims. (Doc. 76 at 4–5.)

Most significantly, Plaintiffs alleged in their Amended Complaint (1) that in or around 2003, Lowe's VP Dale Pond told John Zalonis, a principal of a different in-store service provider, that Lowe's plan was to eventually take over the ISSPs' business and that this plan was

2

to be kept a secret, and (2) that the In-Store Services Strategy was memorialized in board minutes created by Greg Bridgeford. (Doc. 79 at 12.)

Plaintiffs have alleged a number of other facts they deem adequately supportive of their fraud-based claims:[2]

(1) The "Manufacturers' Revenue Representation";[3]
(2) The "Inducement Representation" regarding PSM's long-term relationship with Lowe's;[4]
(3) Lowe's statements regarding a lack of intent to terminate PSM or assume PSM functions (Doc. 79 ¶¶ 47, 54, 56–58);
(4) The proposed "Cost Reduction Plan B";[5]

---

[2] While a number of these facts are alleged without the Amended Complaint, and so are inappropriate for consideration on a motion to dismiss for failure to state a claim, they are pertinent to the Court's resolution of Plaintiffs' Motion to Compel.

[3] Lowe's representative Marybeth Cornwell stated that Lowe's would contract directly with PSM and others as ISSPs, and that all of the income Lowe's received from the manufacturers would be paid to the ISSPs. (Doc. 79 at 14; Doc. 110-4 at 3.) This representation did not bind Lowe's for any specific term of years, but Lowe's complied with this representation for at least two years before changing the parties' maximum fees by contract. As already noted by the Court, because all contracts contain an integration clause, "any reliance based on [statements regarding the revenue stream] was unreasonable to the extent [they] were not commemorated in the parties' written contracts . . . ." (Doc. 45 at 11.) That the representation was made and that payments were reduced over two years later are "simply inadequate to 'nudge' PSM's claims of fraud 'across the line from conceivable to plausible.'" (Doc. 45 at 10) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009)).

[4] PSM claims that Lowe's officials, via oral statements, "repeatedly misrepresented to PSM and other manufacturers' representatives that the successful bidders would be rewarded with lucrative, secure, and growing contractual relationships with Lowe's," which thereby induced PSM to enter into the initial in-store services agreement. (Doc. 79 at 13.)

[5] This plan, articulated on December 3, 2004, was to collect $40 million from vendors but to spend only $35 million and retain the balance. (Doc. 79-1 at 3.) By itself, the plan reveals the intent to have vendors merge and take advantage of economies of scale, not to cut off the vendors entirely.

3

(5)    Assurances to Clorox;[6]

(6)    The declaration of Jane Jenson;[7]

(7)    The Merchandising In-store Services Agreements ("ISSAs");[8]

---

[6] Plaintiffs allege that around January 2005, Clorox, which provided products for retail sale through Lowe's, sought assurances from Lowe's that all of the money they and other manufacturers were providing to Lowe's would be used exclusively for the purpose of in-store servicing and merchandising. In July 2005, Lowe's responded, stating that all monies would and had been used exclusively for the service and promotion of Clorox's product. (Doc. 79 at 9.)

[7] On an unknown date (the declarant guesses in the 2001–2002 time period), but seemingly before the ISSP plan by which Lowe's would collect fees from vendors and distribute them to service providers, Ms. Jenson, National Sales Manager for Tyco's plastics products, attended a meeting in which Mr. Tillman spoke about the millions of dollars Lowe's was spending on vendor service. The magnitude of the number mentioned caused Ms. Jenson to think to herself, "Oh my God, he's talking like that's Lowe's money." (Doc. 110-3 at 2–3.)

[8] The February 2003 agreement was forwarded to PSM on August 23, 2002, in order to allow PSM to complete infrastructure improvements and other capital expenditures. (Doc. 150 at 5.) As regards this agreement, Article 3 references the applicable fees (2.5% of gross purchases), which "may be amended from time to time by agreement of the parties." (Doc. 79-2 at 4, 16.) PSM argues that this ISSA was terminable for cause and had no expiration date in light of Article 4, "which provides for termination only for (a) breaches of representations and warranties; (b) negligence . . . ; or (c) insolvency . . . ." (Doc. 150 at 6; *accord* Doc. 150-5 at 5.) However, in its Amended Complaint, PSM states, "Each of the ISSAs were one-year agreements ending on January 31 of the following year." (Doc. 79 at 21.) Additionally, Mr. Serey admitted to understanding the 2003 contract to expire the following year. (Doc. 187-11 at 25.)

As regards the February 2004 agreement, with respect to fees, Lowe's reserved "the right to adjust the annual fee commitment" with thirty days' notice in the event "Lowe's experiences extraordinary changes in its retail business based on factors beyond its control." (Doc. 79-3 at 5) (referencing the force majeure clause). Fees were set at 2.5% of gross purchases, specified at twelve payments totaling $17,500,000, with any additional amount needed to reach the full 2.5% to be paid at the end of the fiscal year. (Doc. 79-3 at 18.) In later filings, PSM alleges that Lowe's withheld payment of the January 2004 invoice due under the 2003 ISSA until PSM agreed to the terms of the 2004 ISSA. (Doc. 150 at 10.)

With respect to the February 2005 agreement, Lowe's again reserved a "right to adjust," addressed in the February 2004 agreement, as well as a new, "termination for convenience" provision" under which Lowe's was permitted to terminate the contract for any or no reason by giving thirty days' notice. (Doc. 79-4 at 5.) Fees were set at a maximum of $17,000,000. PSM alleges fiscal coercion in the formation of this contract, stating that payments (specifically, the last monthly payment and the contract-adjustment payment from the 2004 ISSA) were unjustifiably withheld in order to force PSM to accept the reduction in compensation in light of PSM's resultant financial distress.

4

(8) The declaration of Aubrey Junker;[9]
(9) The deposition of James McUmber;[10]
(10) Lowe's vendor-service-group ("VSG" or "ISSP") consolidation plan meeting in early 2004, which referenced the potential elimination of ISSPs;[11]
(11) Robert Niblock's e-mail, dated February 17, 2005, which references a "three-year plan to consolidate Vendor Service Groups" (Doc. 166-3 at 2);[12]

_____

Finally, the September 2005 agreement includes a termination-for-convenience provision, the assignment of intellectual-property rights, and a limitation-of-liability provision. PSM again alleges financial coercion in the formation of this contract.

[9] PSM claims to have learned from Ms. Junker, a past employee of Lowe's, that Lowe's in-store services strategy predated PSM's exclusive business relationship with Lowe's. (Doc. 79 at 11.) However, Ms. Junker states in her second declaration that there was no in-store services program plan predating Lowe's relationship with PSM that called for the elimination of all ISSPs. (Doc. 118 at 1–2.) Dan Helton, PSM's co-counsel, states that this declaration is false and that Ms. Junker had previously stated to him that, from the outset, Lowe's plan was to bring the in-store service work in-house in order to capture those revenues. (Doc. 121-1 at 1–5.)

[10] Mr. McUmber, who from about 2002 through 2004 served as Director of the Business Services Group within Lowe's information-technology department, discussed vendor-service consolidation as a component of Lowe's vendor-service-tracking initiative in January 2003. (Doc. 150-6 at 12, 19.) Mr. McUmber claims to have become aware of plans to take some of the vendor work in-house in late 2002 or early 2003 "because they—as part of the financials they planned to increase headcount." (Doc. 150-6 at 14.) He further testified that Rob Crandall, a financial analyst at Lowe's, wrote in a December 2002 e-mail in response to a program-initiative document prepared by the Business Services Group, "How much of this [vendor service work] could we take in-house and save money?" (Doc. 150-6 at 9.) As a result of a change in early 2003 in the Business Services Group's mandate—of developing systems for vendor service tracking (Doc. 150-7 at 9)—also to include the promotion of service-group consolidation (Doc. 150-6 at 19; Doc. 150-7 at 10, 16), Mr. McUmber came to believe that Lowe's plan in 2003 was to reduce further the number of vendor groups providing in-store service. (Doc. 150-7 at 16.)

[11] Among the topics addressed were "VSGs: not a chance" and "High-level roadmap: consolidation and elimination." However, it is worth noting that on the meeting schedule, right after "VSGs: not a chance" and a short break, the topic of "VSGs: show promise" was discussed, which was in turn followed by another break and the topic of "VSGs: high potential strategic partners." (Doc. 150-9 at 2.)

[12] Recalling that the first Merchandising In-store Services Agreement was part of a large and obvious consolidation effort—reducing the number of ISSPs from hundreds to but a few, including PSM—the Court finds this reference to offer little in the way of advancing Plaintiffs' fraud-based claims.

5

(12)   An e-mail chain involving several Lowe's executives in which the overspending on ISSPs and need to shift tasks from vendors to stores were discussed;[13]
(13)   The deposition of John Varnell;[14] and
(14)   Other, miscellaneous representations with regard to vendor stability.[15]

As Defendant notes, the Court has already concluded that the additional allegations, if proven, might allow Plaintiffs to show that Lowe's statements were false when made or were made with the intent to deceive. (Doc. 76 at 5; Doc. 99 at 6.) As will be discussed below, however, the Court's conclusion turned on Plaintiffs' allegations regarding Mr. Pond's statements to Mr. Zalonis and Mr. Bridgeford's board minutes.

## II. STANDARDS OF REVIEW

A.  The Standard Applicable to Defendant's Motion to Strike

Per Federal Rule of Civil Procedure 12(f), the Court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. While motions to strike are disfavored, *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001), the Court has broad discretion in ruling on such motions, *Norkunas v. Miran Hospitality*, No. 3:09-434, 2010 WL 271744, at *1 (W.D.N.C. Jan. 14, 2010) (Conrad, C.J.).

---

[13] Several exhibits throughout the record reference this cost-cutting initiative. However, these documents do not speak to Lowe's intent at the time of the 2003 contract.

[14] Mr. Varnell testified that in late 2002 or early 2003, CEO Robert Tillman stated that Lowe's had been evaluating for about a year and a half the prospect of moving vendor services in-house but that such a transition proved too complicated. Mr. Tillman went on to say, "We got you guys doing your thing and doing a great job for us. . . . [T]he combination we have right now . . . [is] working great. But if we do decide to bring it in-house, we'll come to good partners like yourself and buy you out to start a base from." (Doc. 166-11 at 3.)

[15] These representations include Lowe's allegedly fraudulent misrepresentation in early 2006 to PSM following an annual sales meeting in Las Vegas (Doc. 79 at 10–11) as well as an alleged statement by Ron Lutz in February 2005 that PSM was doing a great job and that rumors of termination were not true (Doc. 79 at 11).

B.  The Standard Applicable to Defendant's Motion to Dismiss

A motion filed per Rule 12(b)(6) challenges the legal sufficiency of a complaint, *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006), measured by whether it meets the standards stated in Rule 8 (providing general rules of pleading), Rule 9 (providing rules for pleading special matters), Rule 10 (specifying pleading form), Rule 11 (requiring the signing of a pleading and stating its significance), and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted), *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). While a complaint need not contain detailed factual allegations, the courts require more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (applying Rule 8).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (quoting Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The decisive standard is that the combined allegations, taken as true, must state a "plausible," not merely conceivable, case for relief. *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.) (citing *Iqbal*, 556 U.S. at 678–82). To have facial plausibility—a standard that lies between the outer boundaries of a probability requirement and the mere possibility of unlawful conduct—the pleading must contain factual content that permits the court, using its "judicial experience and common sense," reasonably to infer the defendant's liability. *Id.*

C. The Standard Applicable to Defendant's Objection to the Magistrate Judge's Order Granting Plaintiffs' Motion to Compel

Federal Rule of Civil Procedure 72(a) provides that "[t]he district judge to whom the case is assigned shall consider . . . objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Findings are "clearly erroneous when although there is evidence to support [them], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (quotation omitted).

Under Federal Rule of Civil Procedure 26(b)(1), ". . . [p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." However, such a broad rule allowing liberal discovery does not necessarily bestow upon a party the right to have his or her attorney depose a highly ranked corporate executive.

The "apex doctrine," rooted in Federal Rule of Civil Procedure 26,[16] was developed as an aid in ensuring that the liberal rules of procedure for depositions are used only for their intended purpose and not as a litigation tactic to create undue leverage by harassing the opposition or

---

[16] Rule 26(b)(2)(C) reads, "On motion or on its own, the court must limit the frequency or extent or discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; . . . or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues." *See also* Fed. R. Civ. P. 26(c) (addressing the circumstances under which the court may grant a protective order).

inflating its discovery costs.[17] In its stronger form, the doctrine holds that, before a plaintiff may

depose a defendant corporation's high-ranking ("apex") officer, that plaintiff must show that "(1)

the executive has unique or special knowledge of the facts at issue and (2) other less burdensome

avenues for obtaining the information sought have been exhausted." *Wal-Mart Stores, Inc. v.*

*Vidalakis*, No. 5:07-39, 2007 WL 4591569, at *1 (W.D. Ark. Dec. 28, 2007) (citation omitted).[18]

While the Fourth Circuit has never discussed the apex doctrine, Wright and Miller address its

underlying considerations:

> A witness ordinarily cannot escape examination by denying knowledge of any
> relevant facts, since the party seeking to take the deposition is entitled to test the
> witness's lack of knowledge. Protective orders are sometimes granted on such
> grounds where there appears a clear risk of abuse because the proposed deponent is
> a busy government official, or a very high corporate officer unlikely to have personal
> familiarity with the facts of the case.

8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2037 (3d ed. 2012) (footnotes

omitted). The Court, attuned to the potential for abuse in the deposition of high-level corporate

---

[17] The 2000 amendments to Rule 26(b) were designed "to involve the court more actively in regulating the breadth of sweeping or contentious discovery." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000).

[18] Federal and state courts addressing some form of the apex doctrine have been inconsistent with regard to the burden of persuasion to be applied. *Compare Liberty Mutual Co. v. Superior Court*, 13 Cal. Rptr. 2d 363 (Cal. Ct. App. 1992) (holding that the deposing party must show good cause that the apex officer has unique or superior personal knowledge of discoverable information), *and Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. 05-4374, 2007 WL 205067 (N.D. Cal. Jan. 25, 2007) (holding that the party seeking the deposition, not the party seeking protection, had the "burden to justify these apex depositions"), *with Crest Infiniti v. Swinton*, 174 P.3d 996 (Okla. 2007) (rejecting the apex rule because it places the burden on the party seeking discovery to prove an executive's unique or superior knowledge and applying a state statute that places the burden to show good cause on the party seeking to avoid discovery), *and Staton Holdings, Inc. v. Russell Athletic, Inc.*, No. 3:09-0419, 2010 WL 1372479 (N.D. Tex. Apr. 7, 2010) (holding that the party seeking protection retains Rule 26(c)'s burden of establishing entitlement to quashal and a protective order).

9

employees, will intervene where a requested deposition represents "an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence . . . ." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975); *see also Folwell v. Hernandez*, 210 F.R.D. 169, 173–75 (M.D.N.C. 2002) (permitting but a limited oral deposition of a defendant's CEO and President on those topics within the scope of the executive's unique, personal knowledge).

Put simply, the apex doctrine is the application of the rebuttable presumption that the deposition of a high-ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes "good cause" for such an order as an "annoyance" or "undue burden" within the meaning of Rule 26(c)(1). Should the deposing party fail to overcome this presumption, the court must then limit or even prohibit the deposition.

As there is no question that those to be deposed are apex officers, the Court must address the issue of whether this "apex presumption" is to be applied to the instant case. Given the district courts' "broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]," *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993) (alterations in original) (citing *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)), and the reasonableness of this presumption under many circumstances, the enduring split among the district courts comes at no surprise. However, the Court need not here decide whether it is appropriate to apply the doctrine as a matter of course. *Cf. Van Den Eng v. Coleman Co., Inc.*, No. 05-109, 2005 WL 3776352, at *2 (D. Kan. Oct. 21, 2005) (relying upon "the same standards as any other protective order, while taking into consideration [the] special factors that

10

may apply to [apex] officials" (citing *Thomas v. Int'l Bus. Machs.*, 48 F.3d 487, 483–84 (10th Cir. 1995))). As discussed below, given the record before the Court, the same conclusion is reached regardless of whether the apex presumption is applied.

## III. DISCUSSION

A. Defendant Lowe's Motion to Strike (Doc. 96)

With leave of Court, Plaintiffs PSM filed their First Amended Complaint on December 28, 2010. This Amended Complaint retains counts that were dismissed as a result of the Court's June 4, 2010, Order (Doc. 45), and notes beside each count whether the count is identical to that in the original Complaint, whether the count has been restated, or whether the count has been dismissed—albeit with some carelessness (Doc. 79).[19] PSM apparently does this to make clear that the dismissed claims have been "reserved for purposes of appeal." (Doc. 100 at 1.) PSM expressed no objection to striking the dismissed counts, provided it could make further amendments, and submitted to Lowe's counsel a proposed Second Amended Complaint incorporating such strikes to at least some extent. (Doc. 100 at 2; *but see* Doc. 99 at 2 n.1.) Lowe's, however, objected to this revised complaint due to the addition of a new exhibit and some textual changes and further factual allegations. (Doc. 100 at 2.) PSM therefore requests that

---

[19] Defendant correctly notes that "PSM has not even accurately designated paragraphs as dismissed." (Doc. 97 at 5.) For instance, Count XIII, which was partially dismissed, entails minor textual changes and is labeled "Same As Original Complaint" rather than "Same As Original Complaint – Partially Dismissed," as was done with Count XVI, which was also partially dismissed. (Doc. 79 at 60.) Furthermore, Count XXVII is not properly labeled as "Dismissed," as was done with other dismissed claims, but rather designated as "Same As Original Complaint." (Doc. 79 at 79.)

11

the Motion to Strike be denied.[20]

The Court notes Defendant Lowe's frustration with the lengths of the Complaint and Amended Complaint, which, as described by the Magistrate Judge, have "prolonged the resolution of this case by convoluting this action." (Doc. 127 at 5.) However, the Court's June 4, 2010, Order was clear with respect to which claims have been dismissed, and the Court does not find that the gains from striking the dismissed claims merit any additional delay, particularly at this stage of the litigation. Accordingly, Defendant's Motion to Strike is denied.

B. Defendant Lowe's Motion to Dismiss (Doc. 98)

1. Revisiting the Adequacy of Plaintiffs' Fraud-based Pleadings

Defendant first argues that Counts V, VII, and VIII have not met the pleading standards of Federal Rule of Civil Procedure 9(b). To establish a claim for fraud, a plaintiff must allege facts sufficient reasonably to imply the following elements: "(1) False representation or concealment of a past or existing material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (N.C. 1974) (citations omitted). Thus, a pleading must satisfactorily allege, *inter alia*, that "the defendant made the false representation with intention that it should be acted upon by the plaintiff," *Calloway v. Wyatt*, 97 S.E.2d 881, 884 (N.C. 1957), and that the deceptive representation was reasonably relied upon by the plaintiff, *Johnson v. Owens*, 140 S.E.2d 311, 313 (N.C. 1965). In so alleging, "a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a

---

[20] Plaintiffs PSM further requested that its Second Motion to Amend/Correct Complaint (Doc. 95) be granted (Doc. 100 at 2), but that Motion was appropriately denied per the Order of Magistrate Judge Howell (Doc. 127), filed on May 27, 2011.

person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The averment must include "the time, place, and contents of the false representations, as well as the identify of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citations omitted).

Within their Amended Complaint, Plaintiffs have alleged the existence of certain "Inducement Representations" made by named Lowe's personnel in 2003, namely, (1) that PSM would have a long-term relationship with Lowe's and would be retained to provide in-store vendor services so long as PSM performed well, and (2) that all funds collected for vendor services would be paid to PSM and other ISSPs. (Doc. 79 at 13–14.) Additionally, Plaintiffs have alleged the following:

> Since the filing of its initial complaint and after Lowe's [first] motion to dismiss was filed, the PSM entities have learned that in or around 2003 Lowe's employee Dale Pond, a Lowe's senior executive vice president of merchandising and marketing, told John Zalonis, a principal of in store service provider Product Management, Inc., that Lowe's plan was to eventually take over the ISSP's businesses, but that was to be kept a secret.
> Since the filing of its initial complaint, the PSM entities have learned that Lowe's "In-Store Services Strategy" as described herein is memorialized in various documents including but not limited to, board minutes and other documents created by or at the direction of Greg Bridgeford, a high ranking executive with Lowes who was at some point tasked by Lowes with following through on the "In-Store Services Strategy."

(Doc. 79 at 12.)

The alleged representation regarding PSM's long-term relationship with Lowe's (the first of the "Inducement Representations"), proximately timed statements by Mr. Pond, and memorialization of the "In-Store Services Strategy" within board minutes associated with Mr. Bridgeford are together adequately particular to establish a claim for fraud. Presuming the alleged

13

statements by Mr. Pond and contents of the documents created at the direction of Mr. Bridgeford to be true, it is reasonable to infer that the named Lowe's officials, during and after the bidding process for ISSP contracts, promised PSM a secure and long-term relationship as an ISSP while knowing that Lowe's would terminate PSM and take over its functions, that the promises were made to induce PSM to enter into an exclusive business relationship with Lowe's, and that PSM reasonably relied on these statements and was harmed as a result. (*See* Doc. 79 at 12–13, 48.)

Unlike the case of Lowe's alleged second "Inducement Representation"—that all funds collected for vendor services would be paid to the ISSPs—the 2003 ISSA does not contain a pertinent provision that would render PSM's reliance unreasonable. (*See* Doc. 45 at 11) (deeming "any reliance based on [representations regarding the revenue stream to be] unreasonable to the extent that these statements were not [memorialized] in the parties' written contracts, which contained merger clauses"). Where the 2003 ISSA contains a fee provision—2.5% of gross purchases—it contains no expiration date, stating only that the term shall commence on February 1, 2003, and "continue until its termination in accordance with Section 4.2," which provides for termination for (a) breaches of representations or warranties, (b) negligence, dishonesty, malfeasance, fraud, or misconduct, or (c) insolvency, a general assignment of assets, termination of business, or other like event. (Doc. 79-2 at 5, 16.) The Court must look outside the four corners of the document to determine the expected duration of this contract for services, which is a matter of dispute.[21] Therefore, Defendant's Motion is denied as to these counts.

---

[21] However, contrary to Plaintiffs' position, "[w]here the parties to a contract express no period for its duration, and no definite time can be implied from the nature of the contract or from the circumstances surrounding them, it would be unreasonable to impute to the parties an intention to make a contract binding themselves perpetually." *Fulghum v. Town of Selma*, 76 S.E.2d 368, 371 (N.C. 1953). Where such circumstances do not imply a period of duration, the

14

Defendant additionally argues that Count VI, Plaintiffs' claim of negligent misrepresentation, should be dismissed. To prevail on a claim for negligent misrepresentation, a party must show (1) that he justifiably relied (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care. *Jordan v. Earthgrains Baking Cos.*, 576 S.E.2d 336, 339 (N.C. Ct. App. 2003). The State of North Carolina has adopted the Restatement (Second) of Torts definition of negligent misrepresentation, *Driver v. Burlington Aviation, Inc.*, 430 S.E.2d 476, 480 (N.C. Ct. App. 1993), and accordingly, Defendant's alleged conduct, described above in relation to Counts V, VII, and VIII, satisfies the requisite pleading requirements, Restatement (Second) of Torts § 552 (deeming a duty of care to arise where "[o]ne who, in the course of his business . . . or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information"). Therefore, Defendant's Motion is also denied as to this count.

2.  PSM's Copyright-based Claims Relating to the GPO System

Defendant has further moved to dismiss Counts XVI(f) and (g), XXIII, XXIV, XXVI, and XXVIII(b) and (e). (Doc. 98 at 1.) These claims regard Lowe's alleged infringement of PSM's copyright in an online-grill-parts-ordering ("GPO") system, developed by PSM for use in Lowe's

---

contract may be terminated by either party upon reasonable notice after a reasonable time. *City of Gastonia v. Duke Power Co.*, 199 S.E.2d 27, 29–30 (N.C. Ct. App. 1973); *Citrini v. Goodwin*, 315 S.E.2d 354, 397 (N.C. Ct. App. 1984). Here, PSM allegedly expended substantial capital "on fixed assets, infrastructure, personnel, reporting and financial and performance projections . . . ." (Doc. 79 at 17; *see also* Doc. 79 at 18, 24.) Therefore, the duration of the contract, being what constitutes a reasonable time on the facts presented and in light of these alleged sunk costs, is a jury question.

15

stores nationwide. (*See* Doc. 45 at 4–6.) PSM allegedly applied for copyright registration on March 25, 2011. (Doc. 110 at 2; *see* Doc. 79 at 74.)

While a copyright in a work "subsists from its creation," 17 U.S.C. § 302(a), the Copyright Act of 1976 (the "1976 Act") requires, in section 411(a), that registration be made as a condition of an infringement action relating to a work first published in the United States.[22] What, then, does it mean to register a copyrighted work? "Stated another way, is a copyright registered at the time the copyright holder's application is received by the Copyright Office (the 'application approach') or at the time that the Office [approves or refuses] the application . . . (the 'registration approach')?" *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615 (9th Cir. 2010) (adopting the application approach), *cert. denied*, 131 S. Ct. 686 (2010). The courts are sharply divided on this question. *Compare Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386–87 (5th Cir. 1984) (adopting the application approach), *and Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631 (7th Cir. 2003) ("[A]n application for registration must be filed before the copyright can be sued upon.") (citing 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.16(B)(1)(a) (2003)), *and Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013 (8th Cir. 2006) ("[T]he copyright owner may not sue for infringement under the federal Copyright Act until the owner has delivered the deposit, application, and fee required for registration to the United States Copyright Office . . . ."), *and* 2-7 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.16(B)(3)(b) (2012) [hereinafter *Nimmer on Copyright*]

---

[22] The 1976 Act provides, in relevant part: "[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). "Registration" is unhelpfully defined as "a registration of a claim in the original or the renewed and extended term of copyright." 17 U.S.C. § 101.

16

(deeming the application approach to "better comport[] with the statutory structure"), *with La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1202–04 (10th Cir. 2005) (adopting the registration approach), *and M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1489 (11th Cir. 1990) (noting that filing suit after receiving the certificate of registration is ordinarily the proper way to proceed), *abrogated in part by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010) (holding that registration is an element of an infringement claim rather than a jurisdictional bar). Although the Court is without binding precedent on the matter, the U.S. District Court for the neighboring Middle District of North Carolina has adopted the application approach. *Iconbazaar, L.L.C. v. Am. Online, Inc.*, 308 F. Supp. 2d 630 (M.D.N.C. 2004) (Tilley, C.J.) (further listing the positions of numerous district courts); *see also Pure Country Weavers, Inc. v. Bristar, Inc.*, 410 F. Supp. 2d 439, 445 (W.D.N.C. 2006) (Thornburg, J.) (allowing the plaintiff to file a supplemental pleading reflecting receipt of the copyright registration after the complaint was filed).

The 1976 Act's claims-processing provision requires only that "registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). Given that "this title" elsewhere specifies that the "effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office," 17 U.S.C. § 410(d), it is arguably the case that so long as the "court of competent jurisdiction" before which the copyright infringement action is pending deems the submission adequate, the copyright infringement action may proceed. Alternatively, however, section 410(d) may be read to say that registration certificates will be backdated to the day on

which a completed application is received. *Iconbazzar*, 308 F. Supp. 2d at 634 (addressing additional ambiguity with respect to section 410(a)). As the words of the statute are ambiguous, the Court is to look beyond those words in order to ascertain and implement the intent of Congress. *United States v. Akinkoye*, 185 F.3d 192, 200 (4th Cir. 1999); *Scott v. United States*, 328 F.3d 132, 138 (4th Cir. 2003).

Given that a claimant with a pending application for registration will ultimately be allowed to proceed regardless of how the Copyright Office treats his or her application, 17 U.S.C. § 411(a) ("[W]here the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights."), and that "[t]he process of processing and evaluating a copyright application could be a lengthy one, during which time an infringing use may continue unchallenged if the owner is not allowed to begin suit," *Iconbazaar*, 308 F. Supp. 2d at 634, it makes little sense to create a period of "legal limbo" in which suit is barred, *Cosmetic Ideas*, 606 F.3d at 620 (citation omitted). The application approach "best effectuate[s] the interests of justice and . . . judicial economy." *Int'l Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am.*, 81 F. Supp. 2d 70, 72 (D.D.C. 2000). "These considerations become especially apropos when one reflects that the Copyright Office typically registers approximately ninety-eight to ninety-nine percent of the claims submitted to it." *Nimmer on Copyright* § 7.16 (citing Brief for the United States as Amicus Curiae Supporting Vacatur & Remand, *Reid Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) (No. 08-103), 2009 WL 1601031, at *4 n.2).

The Court accordingly adopts the application approach. Therefore, Counts XXIII and

XXIV, alleging copyright infringement, cannot be dismissed at this stage for failure to register the copyright.

Defendant further argues that Counts XVI(f) and (g) (claims of breach of duty of good faith and fair dealing), XXVI (claim of conversion), and XXVIII(b) and (e) (claims of unfair and deceptive trade practices), as state-law claims relating to the GPO system, should be dismissed pursuant to section 301(a) of the 1976 Act. (Doc. 99 at 14–15.) Through its authority under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, Congress has preempted all state-law rights that are equivalent to those protected under federal copyright law. Section 301(a) provides that

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright . . . are governed exclusively by this title. . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

Thus, a state law claim is preempted if (1) the work is "within the subject matter of copyright" and (2) the state law creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a); *accord U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997).

In light of the survival of Counts XXIII and XXIV at this stage of the litigation, the parties dispute neither that the GPO system is a work within the subject matter of copyright nor that Plaintiffs' claims of breach of duty of good faith and fair dealing, conversion, and unfair and deceptive trade practices satisfy the second requirement by addressing legal or equitable rights that are "equivalent to" the rights protected under federal copyright law. (*See* Doc. 99 at 15) ("[T]he first prong is satisfied."); (Doc. 110 at 17) ("Preemption applies only if the Court rejects Lowe's motion to dismiss the copyright claims . . . ."). Therefore, Defendant's Motion is granted

19

as to Counts XVI(f) and (g), XXVI, and XXVIII(b) and (e).

C.  Defendant Lowe's Objection to the Magistrate Judge's Order Regarding the Depositions of the Apex Officers (Doc. 171)

As noted above, the Court's leave to amend the Complaint was given in light of (1) the alleged statements of Mr. Pond to Mr. Zalonis, which Plaintiffs learned of "[s]ince the filing of its initial complaint and after Lowe's motion to dismiss was filed," regarding Lowe's intent in 2003 to take over the ISSPs' business, and (2) board minutes memorializing the In-Store Services Strategy, of which Plaintiffs also learned since the filing of its initial Complaint. (Doc. 79 at 12.) However, there has since been no mention of Mr. Zalonis in the record, and such board minutes have not been brought to the Court's attention.

The remaining facts presented fail to establish an adequate basis for anticipating a sufficient benefit, relative to the costs imposed, from the additional depositions requested. The facts relating to Lowe's intentions in the 2002–2003 time frame primarily regard an awareness of vendor-service-group expenditures or the financial tenability of assuming vendor-service-group responsibilities (*see, e.g.*, Doc. 110-3 at 2–3; Doc. 150-6 at 9; Doc. 166-11 at 3), increased headcounts (Doc. 150-6 at 14), and vendor-group-systems development (Doc. 150-7 at 16), which are unsurprising in light of Lowe's 2002–2004 vendor-service-group-consolidation efforts (*see, e.g.*, Doc. 150 at 3). On the record before the Court, it remains true that, although it is conceivable that Lowe's intentionally deceived PSM at the time of the 2003 ISSA's formation, "the much more plausible scenario is that Lowe's . . . simply adopted a new business strategy." (Doc. 45 at 10.)

The discovery deadline has passed, and the record is well developed. Though courts often

20

struggle with the task of determining whether certain discovery requests are abusive,[23] such a task presents little difficulty here. Although the Court is uninfluenced by the executives' disclaimers of pertinent knowledge (Docs. 156, 157, 158); 8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2037 (3d ed. 2012) (noting that witnesses "ordinarily cannot escape examination by denying knowledge of any relevant facts"), Plaintiffs' evidence insufficiently suggests that a plan to eliminate all third-party vendors was developed prior to the 2003 ISSA by those at "the very apex of Lowe's corporate structure" (Doc. 150 at 14). Accordingly, there has been no demonstration that Messrs. Niblock, Bridgeford, and Hull had any relevant personal knowledge of an "In-Store Services Strategy," which entailed the systematic elimination of additional ISSPs and predated PSM's exclusive business relationship with Lowe's, and Plaintiffs' requested depositions are unduly burdensome and unwarranted. Plaintiffs' request fails the test of Rule 26(b)(2)(C). Therefore, Defendant's Objection is sustained, the Magistrate Judge's Order is reversed for clear error, and Plaintiffs' Motion to Compel is denied.

---

[23] The general rule has best been described as follows:
> The plaintiff files a sketchy complaint . . . and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory cannot know the details. Discovery is used to find the details. The judicial officer always knows less then the parties, and the parties themselves may not know very well where they are going or what they expect to find. . . . Judicial officers cannot measure the costs and benefits to the requestor and so cannot isolate impositional requests. Requestors have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define "abusive" discovery except in theory, because in practice, we lack essential information.

Frank H. Easterbrook, *Discovery as Abuse*, 69 B.U. L. Rev. 635, 638–39 (1989).

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant Lowe's Motion to Strike (Doc. 96) be **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Lowe's Motion to Dismiss (Doc. 98) be **GRANTED** in part and **DENIED** in part. Counts XVI(f) and (g), XXVI, and XXVIII(b) and (e) are hereby **DISMISSED** in their entirety.

**IT IS FURTHER ORDERED** that Defendant Lowe's Objection to Magistrate Judge's Decision (Doc. 171) be **SUSTAINED**. Plaintiffs PSM's Motion to Compel (Doc. 149) is hereby **DENIED**.

Signed: September 14, 2012

Richard L. Voorhees
United States District Judge

22